IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL PITTS, et al., )
)
        Plaintiffs, )
)
v. ) 1:20-cv-768 (LMB/IDD)
)
VOLKSWAGEN GROUP OF AMERICA, INC., )
  et al., )
)
        Defendants. )

## MEMORANDUM OPINION

Before the Court is defendant Volkswagen Group of America, Inc.'s ("VWGA" or "defendant") Motion to Dismiss Plaintiff's Amended Complaint ("Motion to Dismiss"), [Dkt. No. 29], which has been fully briefed and for which oral argument has been held. For the reasons that follow, the Motion to Dismiss will be granted.

## I. BACKGROUND

Seven plaintiffs, Michael Pitts ("Pitts"), Andrew Bream ("Bream"), Thomas O'Halloran ("O'Halloran"), Beth Houpis ("Houpis"), Tim Larkin ("Larkin"), Suzanne Oliveira ("Oliveira"), and Thomas Terveer ("Terveer") (collectively, "plaintiffs") have brought this civil action against VWGA and Audi AG ("Audi" or "defendant) on behalf of themselves and a class of similarly-situated owners of Audi vehicles. Audi is a German company which designed and manufactured the plaintiffs' vehicles.[1] [Dkt. No. 25] at ¶ 63. VWGA—which is incorporated in New Jersey and headquartered in Herndon, Virginia—is Audi's sales and marketing arm in the United States. Id. at ¶ 62.

---

[1] Defendant Audi has not been served and has not entered an appearance in this matter.

Since at least 2017, Audi's vehicles have been outfitted with a "Start/Stop system" that is meant to reduce carbon emissions that are released when a vehicle is idling in traffic or while parked. The system reduces these emissions by shutting off the engine when the brake is depressed far enough to stop the vehicle. Id. at ¶ 1, 4. According to plaintiffs, the Start/Stop system is defective in all non-hybrid Audi models made between 2017-2020 ("Affected Vehicles")[2] because it "shuts off the engine too soon, so as to disengage power steering and power brakes before the vehicle has come to a stop," and because it does not "restart the engine immediately when the vehicle begins moving." Id. at ¶ 1. The Amended Complaint does not specify any manufacturing defect or system programming error that produces the complained-of defect. Although it is impossible to disable the Start/Stop system permanently, it can be turned off each time the car is started. Id. at ¶ 128.

Plaintiffs allege that they would not have purchased or leased the Affected Vehicles if they had known about the alleged Start/Stop defect, and they claim to have been injured by the "diminution in value and the costs of repairs required to ameliorate the defect." Id. at ¶ 119, 120. The Amended Complaint does not assert that any accidents have resulted from this alleged defect and does not identify any plaintiff who has had the system removed. The Affected Vehicles came with a Warranty Package, which covered the Affected Vehicle for 4 years or 50,000 miles, for "defects in manufacturer's material and workmanship." Id. at ¶ 123. More specifically: "The warranty covers any repair or replacement to correct a defect in manufacturer's material and workmanship (i.e., a mechanical defect). Your authorized Audi dealer will repair the defective part or replace it with a new or remanufactured Audi Genuine Part free of charge." Id. at ¶ 126.

---

[2] The full list of Affected Vehicles by model can be found in Paragraph 5 of the Amended Complaint.

2

Plaintiffs allege that when owners of the Affected Vehicles have complained about the Start/Stop system to Audi service centers, the service centers have "refused to repair the defect or provide alternative/replacement transportation that is not defective." Id. at ¶ 127.

The named plaintiffs allege that they own Affected Vehicles and have been endangered by the Start/Stop system. Pitts, who is a resident of Florida and who purchased his vehicle on March 9, 2019 from an Audi dealership, claims that he nearly had an accident after losing power steering and brakes, causing him to coast into an intersection. Pitts took his vehicle to an Audi service center, where the service department told him that the car was "learning [his] driving pattern," and otherwise operating normally. [Dkt. No. 25] at ¶¶ 13-20. Bream, a resident of Minnesota who purchased his vehicle from an Audi dealership on January 19, 2018, claims that his vehicle lurches forward when the engine re-engages, and his windshield wipers are disabled by the system, limiting his visibility. Bream does not allege that he made any effort to have the Stop/Start system repaired. Id. at ¶¶ 21-27. Houpis is a California resident who purchased her vehicle from an Audi dealership on October 19, 2017. She took her vehicle back to the dealership to get a primer on its features and told a salesperson that the Start/Stop system "seemed to shut the engine off too soon." Id. at ¶ 30. The salesperson told her she could turn the system off, but at her next service appointment she was told she should leave it on to save gas and reduce emissions. Id. She alleges that once when she was driving her vehicle, the dashboard indicator light for the Start/Stop system came on, but it went off when she restarted her engine and never came on again. Id. Larkin, a Washington resident, purchased his vehicle on May 1, 2019 from an Audi dealership. On his way home from the dealership after buying the vehicle, he noticed that the Start/Stop system turned his engine off before the vehicle came to a complete stop. He called the dealership, and he was told that he could turn the system off it he did not like

it. Id. at ¶¶ 35-42. Oliveira is a California resident who purchased her vehicle from an Audi dealership on July 1, 2019; O'Halloran is a Colorado resident who purchased his used vehicle from a non-Audi dealership on May 15, 2019; and Terveer is an Ohio resident who purchased his used vehicle from a non-Audi dealership on December 19, 2019. Id. at ¶¶ 43, 49, 56. Oliveira, O'Halloran, and Terveer each allege that because of the Start/Stop system, their brakes become "heavy" and the power steering becomes "extremely difficult to use." Id. at ¶¶ 45, 52, 59. O'Halloran and Oliveira also allege that they brought their concerns to the attention of Audi dealerships or service centers, but they were told that there was no error and no way to turn the system off permanently. Id. at ¶¶ 47, 53. Terveer does not allege any attempts to address his concerns about the Start/Stop system with any dealership or repair service.

Plaintiffs allege that defendants have been aware of complaints about the Start/Stop system since 2017.[3] Examples include complaints submitted online with the National Highway Traffic Safety Administration, many of which plaintiffs reproduce in the Amended Complaint. [Dkt. No. 25] at ¶¶ 81-107. Two of the complaints submitted by plaintiffs are from 2017 (in July and August, respectively), while the rest are dated from June 2019 to April 2020. On April 28, 2017, Audi issued a Technical Service Bulletin to its dealers explaining the "complexity" of the Start/Stop system and cautioning that customers might have complaints about the system. Id. at ¶ 73. That Technical Service Bulletin was updated and re-issued again later in 2017 and in 2018. [Dkt. No. 25-1]. Additionally, plaintiffs allege that defendants "monitor[ ] consumer reports and

---

[3] Although plaintiffs cite a 2017 class action filed in California as early evidence of defendants' awareness about the alleged Start/Stop system defect, that action specifically complained that the system would not start again if the driver's seat belt was not fastened, an issue not raised by any plaintiff in this action. See Makaryan v. Volkswagen Group of America, Inc., No. 2:17-cv-5086 (C.D. Cal., voluntarily dismissed Nov. 29, 2017).

4

sentiments about its products that appear on social media, blogs, review sites, enthusiast sites and other internet resources." [Dkt. No. 25] at ¶ 111.

The Owner's Manuals for the Affected Vehicles disclose that the Start/Stop system "may turn off the engine before the car comes to a complete stop." Id. at ¶ 79. The Owner's Manual for the 2018 A6 states:

> The Start/Stop system can help increase fuel economy and reduce CO2 emissions.
>
> In Start/Stop mode, the engine shuts off automatically when the vehicle is stopped, such as at a traffic light. The ignition remains switched on during this stop phase. The engine will restart automatically when needed.

It then gives owners the following instructions:

> Brake the vehicle to a stop. The engine stops shortly before the vehicle comes to a stop or if the vehicle is stationary. Keep your foot on the brake pedal. The [A] indicator light appears in the information line at the bottom of the instrument cluster display. The needle in the tachometer also moves into the READY position.
> …
> You can determine for yourself if the engine will stop or not by reducing or increasing the amount of force you use to press the brake pedal. For example, if you only lightly press on the brake pedal in stop-and-go traffic or when turning, the engine will not switch off when the vehicle is stationary. As soon as you press the brake down harder, the engine will switch off.
> …
> If you do not wish to use the system, you can switch it off manually.
>
> To switch the Start/Stop system off/on manually, press the [A Off] button. The LED in the button turns on when the system is switched off.

[Dkt. No. 30-2] at 70-72 (footnotes omitted); see also [Dkt. No. 31-1] at 78-80; [Dkt. No. 32-3] at 85-88; [Dkt. No. 34-2] at 84-87. Under the heading "Stopping and starting the engine," the Owner's Manual cautions drivers that when the engine is turned off, "[t]he full function of the brake booster and the power steering is not guaranteed. You may need to use more force when braking or steering," and that as a result turning off the engine before the vehicle is stopped "could lead to accidents and serious injuries." [Dkt. No. 30-2] at 69; see also [Dkt. No. 31-1] at

77 ("Please note that the brake booster and power steering only work when engine is running …. Because the usual steering and braking capability is not available, the risk of accidents or injuries increases."); [Dkt. No. 32-3] at 84 (similar); [Dkt. No. 34-2] at 83 (similar).

Plaintiffs allege that the way in which the Start/Stop system functions is in conflict with defendants' advertising campaign, on which they spend "millions of dollars" and which focuses on "claims of advanced technology, safety and dependability," and that such issues of "[s]afety and dependability are material to consumers when purchasing or leasing a vehicle." [Dkt. No. 25] at ¶¶ 113, 116. These advertising efforts include booklets that "emanate from" VWGA's Herndon headquarters, and state that Audi is "dedicated to ensuring that you enjoy exceptional quality, dependability, and peace of mind throughout your ownership experience." Id. at ¶ 117.

Plaintiffs filed their original class action complaint on July 9, 2020. After defendant VWGA moved to dismiss for failure to state a claim, plaintiffs filed an Amended Complaint on September 17, 2020, and VWGA consented to the denial of its motion as moot. [Dkt. Nos. 27, 28]. The Amended Complaint alleges 14 counts. Counts I, II, and III are brought on behalf of a nationwide class, and respectively allege violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., common law fraudulent concealment, and violations of the Virginia Consumer Protection Act. (Plaintiffs do not contest VWGA's motion to dismiss Count III, which does not allege that any tortious conduct occurred in Virginia.) Counts IV, V, and VI are brought on behalf of state subclasses in Florida, California, Colorado, Ohio, Minnesota, and Washington, and respectively allege breach of contract, breach of implied warranty of merchantability, and breach of the covenant of good faith and fair dealing. Counts VII-XIV are brought under state-specific consumer protection acts.

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint when a "plaintiff's allegations fail to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). A complaint must be more than speculative, and must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (internal quotation marks and citations omitted). When considering a motion to dismiss, the court assumes that the facts alleged in the complaint are true and resolves factual disputes in the plaintiff's favor, Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009); however, a court "is not bound by the complaint's legal conclusions," conclusory allegations, or unwarranted inferences. Id. At the motion to dismiss stage, courts are generally limited to those facts presented in the complaint; however, a court may consider documents attached to the defendant's motion where they are "integral to and explicitly relied on in the complaint." Phillips v. LCI Intern, Inc., 190 F.3d 609, 618 (4th Cir. 1999); see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).

### B. Analysis

Although plaintiffs have raised a number of different causes of action, each fits roughly into two baskets: those based on a breach of either contract or warranty, and those based on fraud.

1. Breach Claims

In Count IV, plaintiffs in the Florida, California, Colorado, Ohio, Minnesota, and Washington subclasses allege that defendants have breached a sales contract. [Dkt. No. 25] at ¶¶ 197-202 (Count IV). As a threshold issue, VWGA contends that without privity, there can be no breach of contract, and the plaintiffs lack privity with VWGA because they purchased their Affected Vehicles from various dealerships rather than directly from VWGA, "a remote importer and distributor." [Dkt. No. 30] at 6-8. Plaintiffs have conceded this point with respect to two named plaintiffs, O'Halloran and Terveer, who purchased their vehicles from non-Audi dealerships, but argue that the authorized Audi dealerships from which the other named plaintiffs purchased their Affected Vehicles act as agents for VWGA. This argument is supported by the Amended Complaint, in which plaintiffs allege, among many other specific facts related to agency, that VWGA supervises authorized dealers regularly, sets the standards by which the dealerships must operate when selling Audis, and controls how salespeople are compensated, tested, and certified. See [Dkt. No. 25] at ¶ 131. These detailed allegations are enough to withstand a motion to dismiss. Moreover, whether or not an agency relationship exists is generally a question of fact. See, e.g., Flamenbaum v. Orient Lines, Inc., No. 03-22549-civ, 2004 WL 1773207, at *9 n.5 (S.D. Fla. July 20, 2004) ("The existence of the alleged agency relationship is usually a question of fact that is not properly considered on a motion to dismiss.").

Nevertheless, even for those plaintiffs for whom privity is adequately pleaded, the breach of contract claim fails because the Amended Complaint does not plead that any breach occurred. Plaintiffs argue that a contract formed by the sale of a vehicle is breached where "consumers received a product other than the one for which they bargained consideration." [Dkt. No. 40] at 11-12 (quoting Bledsoe v. FCA US LLC, 378 F. Supp. 3d 626, 645 (E.D. Mich. 2019)). Bledsoe, a Michigan case even though there are no Michigan plaintiffs in this lawsuit, is the only case

offered by plaintiffs to support their theory of breach, and it involves very different facts than those raised in this action. In Bledsoe, "Plaintiff's allegation [was] that Defendants knowingly installed and caused to operate a device whose only purpose was to circumvent the regulatory safeguards in place for emissions and fuel economy." Id. at 645. The court found that the breach of contract claim was plausible because, by installing a device meant to defeat the promised feature of lower-emissions vehicle, the defendants did not sell the plaintiffs the car that they had promised to sell them. Id. In contrast, the allegation in this litigation is very different. Plaintiffs characterize the breach as "VWGA's decision to continue to sell the Affected Vehicles even though it knew that they were equipped with defective Start/Stop systems that rendered the cars unsafe, all the while advertising and promoting the Affected Vehicles as safe, reliable and technologically advanced." [Dkt. No. 40] at 20-21. In other words, they allege that the Start/Stop system, with which they knew the vehicle was equipped, was less safe than they had believed based on advertisements that are not part of their contracts—not that the vehicles were different products than what they bargained for. Those facts do not support a breach of contract claim.

Plaintiffs also allege that defendants breached the implied warranty of merchantability for the Affected Vehicles,[4] both as to the nationwide class under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, et seq. (which is derivative of state law),[5] and under the state

---

[4] Although the Amended Complaint gives every indication that plaintiffs are pursuing claims based on express warranties in addition to implied warranties, they disclaim any such theory of liability in their Opposition: "Plaintiffs have not brought state law claims for breach of express warranty, and do not pursue such claims under the MMWA." Compare [Dkt. No. 41] at 14-15 with [Dkt. No. 25] at ¶ 120.

[5] VWGA argues that the MMWA claim must be dismissed because under the Act, "No claim shall be cognizable ... if the action is brought as a class action, and the number of named plaintiffs is less than one hundred." 15 U.S.C. § 2310(d)(3)(C). Plaintiffs urge this Court to follow the decisions in the Sixth Circuit and this district by finding that the MMWA's requirement of at least 100 plaintiffs is superseded by the Class Action Fairness Act, which

9

commercial codes of Florida, California, Colorado, Ohio, Minnesota, and Washington. [Dkt. No. 25] at ¶¶ 151-165, 203-216 (Counts I, V). The basic requirement for any claim based on the implied warranty of merchantability is that the plaintiff must allege that the goods received are not fit for their ordinary use. See, e.g., De La Paz v. Bayer Healthcare LLC, 159 F. Supp. 3d 1058, 1097 (N.D. Cal. 2016) ("A breach of the implied warranty of merchantability occurs if the product lacks 'even the most basic degree of fitness for ordinary use.'"); Dougall v. Bay Boat Works & Sales, Inc., 287 Minn. 290, 294 (1970); Green v. Am. Tobacco Co., 154 So.2d 169, 171-172 (Fla. 1963). VWGA asserts that "[t]he ordinary purpose of a car is to provide transportation," and as long as plaintiffs continue to drive their Affected Vehicles, they have no claim based on the implied warranty of merchantability. [Dkt. No. 30] at 18. Plaintiffs accurately rejoin that "[m]any courts have rejected this crimped definition that 'cars are [ ] merchantable merely because they are able to provide transportation. Rather, to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects.'" [Dkt. No. 40] at 17 (citing Matanky v. Gen. Motors LLC, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019)).

Plaintiffs' breach of implied warranty claims fail because they do not allege that the Affected Vehicles are not "substantially free of defects." Plaintiffs cite two cases (only one of which originates from a state whose law is at issue here) as examples of defects breaching an implied warranty of merchantability. In Sloan v. General Motors, LLC, the "unreasonable safety hazard" at issue caused "engine damage, fouled spark plugs, engine misfires, [and] emission of

---

creates an independent jurisdictional basis for a class action brought under the MMWA. See [Dkt. No. 40] at 13-14 (citing In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Prods. Liab. Litig., 2015 U.S. Dist. LEXIS 189401, at *158 (E.D. Va. Dec. 11, 2015) (Trenga, J.)). Because, as explained later, there is simply no factual basis for plaintiffs' MMWA claim, the Court need not resolve this disputed area of law:

white smoke," all of which "created a fact question for the jury regarding the reliability and safety of the vehicles." 287 F. Supp. 3d 840, 879 (N.D. Cal. 2018). In <u>Click v. General Motors, LLC</u>, the plaintiffs alleged that their vehicles contained "defective CP4 fuel injection pumps," which produced a "worst case scenario of a truck spontaneously stalling at high speeds." 2:18-CV-455, 2020 WL 3118577, at *1, *11 (S.D. Tex. Mar. 27, 2020). Both <u>Sloan</u> and <u>Click</u> involved allegations of actual manufacturing defects, whose consequences were not "mere inconvenience[s]," but rather "unreasonably dangerous" driving conditions "depriving the vehicles of fitness for their purposes of transportation." <u>Click</u>, 2020 WL 3118577 at *11. That is simply not the kind of defect pleaded in the Amended Complaint; instead, plaintiffs have "label[ed] their criticism of the manner in which the system operates as the 'defect.'" [Dkt. No. 41] at 3. What is more, unlike any of the defects in the cases cited by plaintiffs, the system which they criticize is optional in that it can be turned off by pushing a single button. [Dkt. No. 30-2] at 70-72. Although plaintiffs may be frustrated by the requirement that they must push the button every time they start the engine to disengage the Start/Stop system, they offer no authority that supports treating that frustration as an actionable breach of implied warranty of merchantability.

Last among their claims premised on breach, plaintiffs allege in Count VI that defendants have breached the covenant of good faith and fair dealing because "Plaintiffs and Class members had a reasonable expectation that, when they purchased their Affected Vehicles from Defendants, the Affected Vehicles would be free of defects," and because defendants "used their discretion to place defective Start/Stop systems into Affected Vehicles without informing Plaintiffs and Class members that the Defective Start/Stop systems would create a safety defect in the Affected Vehicles." [Dkt. No. 25] at ¶¶ 222-23. VWGA argues that this count should be dismissed "as redundant" because "the conduct allegedly violating the implied covenant is also

the basis of the companion cause of action alleging breach of contract/warranty." [Dkt. No. 30] at 14-15. Plaintiffs respond that the claims in Count VI are based on entirely separate conduct involving the "manipulation of the Audi Warranty." [Dkt. No. 41] at 21. Plaintiffs' characterization is not consistent with the allegations actually pleaded in Count VI, which focus on the contract created by the sale of the vehicles, and which do not use the word "Warranty" or discuss any unsuccessful attempts by plaintiffs to have their cars serviced under the terms of the Audi Warranty. See [Dkt. No. 25] at 217-226.

Even if the Court were to accept plaintiffs' interpretation of the allegations in Count VI, that count must still be dismissed. Specifically, plaintiffs argue in their Opposition that VWGA breached the covenant of good faith through "manipulation of the Audi warranty to minimize its obligation to fix the Start/Stop Defect in Affected Vehicles," because "when owners of the Affected Vehicles complain about the dangerously defective Start/Stop system, they are told they are operating normally and owners should turn the system off if they don't like how it works." [Dkt. No. 40] at 21. This argument does not reflect any failure by VWGA to "effectuate the intentions of the parties or to honor their reasonable expectations." Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995); see also Newman v. Emerson Radio Corp., 48 Cal.3d 973, 989 (1989). All the plaintiffs who allege that they brought their cars to an Audi service center to have the Start/Stop systems repaired according to the warranty also allege that their cars were examined and that they were told there were no error codes for the system or any deviations from how the system was supposed to function. See [Dkt. No. 25] at ¶ 19 (Pitts), ¶ 30 (Houpis), ¶ 53 (Oliveira). The other four named plaintiffs did not allege that they took their cars to an Audi service center. Instead, two allege that they spoke to the dealership that sold the car about their dissatisfaction, id. at ¶ 39 (Larkin), ¶ 47 (O'Halloran, who also contacted his personal

12

mechanic); and two do not allege any facts about attempts to remediate any defects. Id. at ¶¶ 21-27 (Bream), ¶¶ 56-61 (Terveer). Plaintiffs do not cite any authority that would support the counterintuitive finding that a defendant breaches a duty of good faith by inspecting a vehicle and finding that it is functioning as it was designed to do.

Instead, plaintiffs cite to the New Jersey case Dewey v. Volkswagen AG, in which the court permitted a claim based on breach of the covenant of good faith and fair dealing to go forward in a case involving alleged vehicle defects. 558 F. Supp. 2d 505, 531–32 (D.N.J. 2008). Dewey, involved "design defects in the Class Vehicles' pollen filter gasket areas and sunroof drains" which caused the interior of the vehicles to flood, with flooding clearly not being an advertised feature of the vehicles. Id. at 510-11. In a brief discussion of the good faith and fair dealing claim, the court observed that "[t]he implied covenant exists so 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Id. at 531 (citations omitted). The New Jersey court found that plaintiffs had adequately alleged that the defendants' persistence in not remedying the design defect was driven by malice, satisfying the elements of the claim. Id. Unlike in the New Jersey case, plaintiffs have failed to allege any facts rising above the conclusory level that defendants acted with malice. Moreover, they have not alleged any malice by the Audi service centers in failing to find anything wrong with the vehicles. Dewey therefore does nothing to save plaintiffs' claim, and for these reasons Count VI will be dismissed.

2. Fraud Claims

Plaintiffs allege common law fraudulent concealment on behalf of the nationwide class (Count II), and various state law-specific claims based on state consumer protection or false

13

advertising statutes (Counts VII-XIV).[6] Importantly (and in further apparent contradiction of the Amended Complaint[7]), plaintiffs assert in their Opposition that they make no claims premised on affirmative misrepresentations. [Dkt. No. 40] at 23. Instead, plaintiffs describe their fraud claims as "based on omissions—i.e., what VWGA was obligated to disclose but instead 'suppressed' and 'concealed.'" Id. Regardless of the basis of the fraud allegations, Federal Rule of Civil Procedure 9 requires that such allegations be pleaded "with particularity" as to the "circumstances constituting fraud or mistake."

The Amended Complaint does not identify any information about the Start/Stop system that was suppressed or concealed. According to plaintiffs, the Start/Stop system is defective because it "shuts off the engine too soon, so as to disengage power steering and power brakes before the vehicle has come to a stop," and because it does not "restart the engine immediately when the vehicle begins moving." [Dkt. No. 25] at ¶ 1. The Affected Vehicles' Owner's Manuals clearly describe what happens when the Start/Stop system is employed: "[t]he engine stops shortly before the vehicle comes to a stop or if the vehicle is stationary." See, e.g., [Dkt. No. 30-

---

[6] Count VII alleges violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.; Count VIII alleges violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; Count IX alleges violations of California's Consumers Legal Remedies Act, Cal. Bus. & Prof. Code §§ 1750, et seq.; Count X alleges violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.; Count XI alleges violations of Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-105; Count XII alleges violations of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, et seq.; Count XIII alleges violations of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01, et seq.; and Count XIV alleges violations of the Washington Consumer Protection Act, §§ 19.86.010, et seq.

[7] The Amended Complaint devotes an entire section to statements in defendants' advertising that their vehicles are safe and reliable, [Dkt. No. 25] at ¶¶ 113-118, and frequently includes allegations of "misrepresentations" in other claims. See, e.g., id. at ¶¶ 162, 250, 255, 284-291 (Count X based on California False Advertising Law), 301, 318, 339, 365. In their Opposition, plaintiffs now claim that these allegations are "primarily to demonstrate the materiality of the omissions at the core of Plaintiffs' fraud claims." [Dkt. No. 40] at 23.

1] at 70-72. The manuals go on to explain that as the driver, "You can determine for yourself if the engine will stop or not by reducing or increasing the amount of force you use to press the brake pedal. For example, if you only lightly press on the brake pedal in stop-and-go traffic or when turning, the engine will not switch off when the vehicle is stationary. As soon as you press the brake down harder, the engine will switch off." Id. Comparing the allegation of the "defect" to the description of the correctly operating Start/Stop system in the Owner's Manuals reveals no daylight between them—for better or worse, the "defect" is simply how the system is supposed to operate.

Plaintiffs do not contest that the Owner's Manuals accurately describe the Start/Stop system or that the Manuals would generally constitute an adequate disclosure. Instead, they argue that the disclosures in the Owner's Manuals are fraudulent because:

> [T]he Audi manuals describe one operating aspect of the system, that it will shut down the engine while it is still in motion, but they are completely silent on the defect, that the system is designed such that this shutdown (1) causes the loss of power steering and power brakes while the car is still moving; and (2) prevents the use of power steering and power brakes when the engine starts back up and lurches forward.

[Dkt. No. 40] at 25-26. Contrary to plaintiffs' argument, the Owner's Manuals for the Affected Vehicles do explain the consequences of an engine shut-down for the power steering and brakes. See [Dkt. No. 30-2] at 69 (warning that "[t]he full function of the brake booster and the power steering is not guaranteed" when the engine is turned off); [Dkt. No. 31-1] at 77 (warning that "that the brake booster and power steering only work when engine is running"); [Dkt. No. 32-3] at 84; [Dkt. No. 34-2] at 83.

Even if the Owner's Manuals were considered less explicit than they should have been, that would not amount to fraudulent concealment. See Restatement of Torts 2d § 550 cmt. a (fraudulent concealment exists "when the defendant <u>actively conceals a defect</u> or other

15

disadvantage in something that he is offering for sale to another") (emphasis added). Where the allegedly concealed fact is an obvious result of information that was disclosed—like the loss of engine power leading to the loss of power brakes and steering—there is no cause of action based on the omission. See, e.g., Polygon Nw. Co. LLC v. La.-Pac. Corp., No. C11–620 MJP, 2012 WL 2504873, at *6 (W.D. Wash. June 28, 2012) (no fraudulent concealment because "the general duty to disclose material facts arises only when the facts are known to the seller but not easily discoverable by the buyer"); Stafford v. Rite Aid Corp., 17-cv-01340-AJB-JLB, 2017 WL 6497678, at *4 (S.D. Cal. Dec. 19, 2017) (similar).

Because the Amended Complaint fails to allege an actual omission or concealment by defendants, it is not necessary to reach VWGA's additional arguments that plaintiffs have not adequately pleaded defendants' knowledge of the omitted or concealed information, or plaintiffs' reliance on that information, as required by all the state causes of action. See [Dkt. No. 30] at 22-25, 27-28. VWGA's argument that plaintiffs have not adequately pleaded that VWGA had pre-sale knowledge of the defect is weak, particularly considering that its position is that the alleged "defect" is actually "criticism of the manner in which the system operates." [Dkt. No. 41] at 3. By taking the position that plaintiffs have only described the Start/Stop system as it was intended to work, VWGA has surely foreclosed any realistic argument that it did not know about the condition of the vehicle pre-sale: it must have known about the system because it marketed it as a feature. On the other hand, VWGA makes a much stronger argument that plaintiffs have not sufficiently pleaded reliance to satisfy the heightened pleading standards of Rule 9. For each named plaintiff, the Amended Complaint makes general claims that the plaintiff reviewed generic websites, brochures, or advertisements before purchasing the Affected Vehicle, but the Amended Complaint does not identify specific documents or explain in what way any document

caused any plaintiff to believe anything about the Start/Stop system. [Dkt. No. 25] at ¶¶ 20, 23, 27, 31, 42, 48, 55, 61.

The only specific document that any of the named plaintiffs claim they reviewed was the Monroney Label sticker in the window of the vehicles. Plaintiffs Pitts, Houpis, Larkin, Oliveira, and Terveer allege that the "window sticker advertised the Affected Vehicle's various features," that it "did not disclose that the Affected Vehicle possessed any defects," and that they "relied on the advertisements contained within the window sticker when deciding to purchase the[ir] Affected Vehicle[s]." [Dkt. No. 25] at ¶¶ 15, 31, 37, 51, 58. VWGA explained in its Motion to Dismiss that Monroney Labels are "federally mandated and regulated label[s] that merely list[ ] certain vehicle information but [do] not describe or represent systems' functions and/or limitations." [Dkt. No. 30] at 28. Plaintiffs did not address this argument in their Opposition, instead abandoning any theory of reliance based on the window stickers. Because plaintiffs' only other allegations of reliance are conclusory references to advertising material that has not been specifically identified, plaintiffs' fraud claims do not survive the Rule 9 pleading standard.[8]

### III. CONCLUSION

For the reasons stated above, the Motion to Dismiss will be granted and judgment will be entered in favor of defendants by an Order to be issued with this Memorandum Opinion.[9]

Entered this 10 day of February, 2021.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

---

[8] VWGA also offers independent grounds for dismissing the Florida, Ohio, and Colorado claims. Because there is no support for fraud or reliance in the Amended Complaint, this Memorandum Opinion does not address those claims separately. [Dkt. No. 30] at 25-27.

[9] Even though defendant Audi AG has never been served, the reasoning in this Memorandum Opinion would apply equally to that defendant. Accordingly, the claims against that defendant will also be dismissed.

17